**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |
|---|---|
| **ALSI HOLDINGS, LLC.,** | C.A. No.  6:21-cv-01187-ADA |
| *Plaintiff,* | |
| **v.** | PATENT CASE |
| **CURRENT LIGHTING SOLUTIONS, LLC, d/b/a GE CURRENT, A DAINTREE COMPANY, and** | **JURY TRIAL DEMANDED** |
| **HLI SOLUTIONS, INC., f/k/a HUBBELL LIGHTING, INC., both d/b/a HUBBELL CONTROL SOLUTIONS and/or CURRENT,** | |
| *Defendants.* | |

**DEFENDANTS' CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

I.     INTRODUCTION ..................................................................................... 1

II.    CLAIM CONSTRUCTION LAW ............................................................. 1

III.   OVERVIEW OF THE ASSERTED PATENTS............................................ 3

IV.    DISPUTED CLAIM TERMS REQUIRING CONSTRUCTION ..................... 6

       A.    U.S. Patent Nos. 8,322,881 and 9,699,854 ................................. 6

             1.    "a pair of integral multi-faceted side walls that extend from
                   opposite sides of the base member at an angle" ........................ 6

             2.    "the first and second multi-faceted side walls extend away from the
                   lighting strip at an angle"........................................................ 6

       B.    U.S. Patent No. 8,721,114....................................................... 10

             1.    "a first/second reflector extending from the central body adjacent
                   to the first/second group of LEDs for directing light from the
                   first/second group of LEDs in the illumination direction" ..................... 10

       C.    U.S. Patent No. 9,049,753........................................................ 17

             1.    "a communication component positioned between the power
                   supply device and the light source" ........................................ 17

             2.    "monitor for monitoring an operational characteristic of a light
                   source comprised in the light fixture"....................................... 19

                   a.    "monitor for monitoring …" is indefinite.................................. 19

                         (1)    "monitor for monitoring …" is a means-plus
                                function limitation...............................................19

                         (2)    The '753 Patent does not disclose a corresponding
                                structure or algorithm for the "monitor for
                                monitoring …" limitation. .................................21

## TABLE OF AUTHORITIES

### Cases

*Arista Networks, Inc. v. Cisco Sys.*,
    908 F.3d 792 (Fed. Cir. 2018).................................................................................... 1

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech*.,
    521 F.3d 1328 (Fed. Cir. 2008).................................................................................. 3

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)................................................................................ 17

*Halliburton Energy Services, Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008).................................................................................. 3

*Mass. Institute of Tech. and Elecs. For Imaging v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006).................................................................................. 2

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003)................................................................................ 21

*Noah Sys. Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)............................................................................ 3, 21

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................................. 1, 2

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
    989 F.3d 1002 (Fed. Cir. 2021)................................................................................ 21

*Verint Sys. v. Red Box Recorders, Ltd.*,
    166 F. Supp. 3d 364 (S.D. N.Y. 2016)..................................................................... 20

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)................................................................. 2, 3, 20, 21

### Statutes

35 U.S.C. § 112.................................................................................................................. 2, 19

## I.    INTRODUCTION

Current Lighting Solutions, LLC and HLI Solutions, Inc. (collectively "Defendants") request construction of five terms from the seven patents ALSI Holdings ("Plaintiff") asserts in this matter. For each term, Plaintiff simply proposes "plain and ordinary meaning." However, the few constructions proposed by Defendants are firmly supported by the intrinsic evidence of U.S. Patent No. 8,322,881 (the "'881 patent") (DN 1-3), U.S. Patent No. 8,721,114 (the "'114 patent") (DN 1-5), U.S. Patent No. 9,049,753 (the "'753 patent") (DN 1-1), and U.S. Patent No. 9,699,854 (the "'854 patent") (DN 1-2) (collectively, the "Asserted Patents").

## II.    CLAIM CONSTRUCTION LAW

The standards for claim construction are well-established: "[W]ords of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (*en banc*) (internal quotation marks omitted). This analysis focuses on the intrinsic evidence, which includes the claims themselves, the specification and the prosecution history. *Id.* at 1314–17. If the specification reveals "[a] special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess . . . the inventor's lexicography governs." *Id*. at 1316. The "specification's consistent focus" can compel a particular construction of a term. *Arista Networks, Inc. v. Cisco Sys.*, 908 F.3d 792, 798 (Fed. Cir. 2018).

Courts may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treaties." *Phillips*, 415 F.3d at 1317 ("Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words."). Where the intrinsic evidence fails to define a term explicitly or implicitly, "it is appropriate . . . to look to the dictionary

1

definitions of the terms." *Mass. Institute of Tech. and Elecs. For Imaging v. Abacus Software*, 462 F.3d 1344, 1351 (Fed. Cir. 2006). "[E]xtrinsic evidence can shed useful light on the relevant art . . . [but] it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotations omitted).

Claim limitations that describe structure in functional terms are termed means-plus-function limitations and are governed by 35 U.S.C. § 112, ¶ 6.[1]  If a claim limitation does not use the word "means," a presumption exists—but not a strong one—that the limitation does not invoke § 112, ¶ 6. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (*en banc*). A party may overcome the presumption by showing that the claim limitation recites "function without reciting sufficient structure for performing that function." *Id.*

*Williamson* analyzed five factors in determining that a patent challenger overcame the presumption against the application of Section 112, ¶ 6. The Court first examined whether the entire claim term ("distributed learning control module") operated as a substitute for "means" by setting forth the same "black box recitation of structure" for providing a specified function as if the word "means" had been used. *Id.* at 1349-50. Second, the Court analyzed whether the claim term ("module") was simply a "well-known nonce word" for software or hardware that performed a specified function, much like generic terms such as "mechanism," "element," "device," or other "nonce words that reflect nothing more than verbal constructs." *Id.* at 1350.  Third, the Court analyzed whether the prefix "distributed learning control" imparted any structure to the term "module." *Id.* at 1351.  Fourth, the Court examined whether the claim term was drafted in a format consistent with traditional means-plus-function limitations. *Id.* at 1350. Finally, the Court looked

---

[1] *Williamson* addressed means-plus-function issues stemming from 35 U.S.C. § 112, ¶ 6, which in 2011 was changed to 35 U.S.C. § 112(f). For the purposes of this briefing, Defendants refer to the codifications as 35 U.S.C. § 112, ¶ 6.

to whether the remaining claim language described how the "distributed learning control module" interacted with other components such that a person of skill in the art ("POSITA") would be informed of the structural character of the limitation at issue. *Id.*

Courts construe means-plus-function limitations to cover the corresponding structure described in the specification and equivalents thereof. *Williamson*, 792 F.3d at 1347. A structure qualifies as a "corresponding" structure only if "the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *Noah Sys. Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (quotations omitted). If the specification fails to disclose sufficient structure for performing all of the claimed functions, the claims are indefinite. *Williamson*, 792 F.3d at 1351. The definiteness requirement is not satisfied by showing that a person of ordinary skill in the art could create a structure to achieve the claimed functions. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1336 (Fed. Cir. 2008); *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (explaining that the indefiniteness requirement helps "inform the public of the bounds" of the claims).

### III.    OVERVIEW OF THE ASSERTED PATENTS

In this case, Plaintiff asserts Defendants infringe seven (7) patents related to various aspects of light emitting diode ("LED") technology. For instance, the '881 and '854 patents are directed to lighting fixtures incorporating LEDs configured in a manner to amplify and direct light produced by such lighting fixtures. More specifically, the '881 and '854 patents disclose lighting fixtures having lighting strips with LEDs and a specific reflector construction. As shown below, the reflector includes a first side wall (outlined in red) and a second side wall (outlined in blue) that extend the entire length of the lighting strip. Both the first and second side walls also extend from the base (highlighted in green) at the same angle.

3



**DN 1-3 & 1-2, '881/'854 Patents Figs 11A and 11B (annotated).**

The '114 patent is also directed to an LED lighting structure with reflector elements for directing light emitted from each of the LEDs in a specified direction. In a first embodiment (shown below), a first group of LEDs are located on one side wall and a second group of LEDs are located on a second side wall. The first group of LEDs (red) direct light only toward the first reflector (green) element which in turn redirects the light downward (shown by red arrows). The second group of LEDs (blue) direct light only toward the second reflector element (orange) which also redirects the light downward (shown by blue arrows). The second embodiment includes a first reflector (green) for directing only light emitted from a first group of LEDs (red) downward (shown by red arrows) and a second reflector (yellow) for directing only light emitted from a second group of LEDs (blue) downward (shown by blue arrows).

4



**DN 1-5, '114 Patent, Figs. 1 and 7 (annotated)**

Lastly, the '753 patent (as shown by Figure 1 reproduced below) is directed to a light fixture control module operable to communicate with a remote management module. The lighting control module is disclosed as being operable to control one or more LED light fixtures (124a-n) based on instructions received from the remote management module. A user may adjust the operation of the LEDs through the remote management module which transmits to the lighting control module for execution.



**DN 1-1, '753 Patent, Figure 1.**

5

## IV.    DISPUTED CLAIM TERMS REQUIRING CONSTRUCTION

A.    U.S. Patent Nos. 8,322,881 and 9,699,854[2]

1.    "a pair of integral multi-faceted side walls that extend from opposite sides of the base member at an angle"

2.    "the first and second multi-faceted side walls extend away from the lighting strip at an angle"

| U.S. Patent No. 8,322,881 | | | |
|---|---|---|---|
| Claim | Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| 1 | a pair of integral multi-faceted side walls that extend from opposite sides of the base member at an angle | Plain and ordinary meaning | a pair of integral multi-faceted side walls that extend from opposite sides of the base member at the same angle |

| U.S. Patent No. 9,699,854 | | | |
|---|---|---|---|
| Claim | Term | | Defendants' Proposed Construction |
| 1 | the first and second multi-faceted side walls extend away from the lighting strip at an angle | Plain and ordinary meaning | the first and second multi-faceted side walls extend away from the lighting strip at the same angle |

The '854 patent is a direct continuation of the '881 patent, so both share a common specification. Further, the disputed terms for both patents are closely related—they require two side walls (a "pair" or "first and second") that extend from another structure ("base member" or "lighting strip") at "an angle." Finally, both raise the same issue—whether the two side walls that extend from the base member/lighting strip at "an angle" do so at the same angle. Defendants therefore address these limitations together.

---

[2] In accordance with Standing Order OGP 4.1, the term for the '854 patent is similar to the term of the '881 patent. Since the terms are similar, and the patents are from a related family, Defendants have placed this term in this section since the '881 patent is the lowest number.

6

The intrinsic record of these patents demonstrates that each of the two side walls extending from the base member/lighting strip at "an angle" extends at the *same* angle. Focusing first on the plain claim language, since both claims use a singular term ("an angle") to describe how both walls extend, they must extend at the same angle. If the walls did not extend at the same angle, one could not say that both extend at "an angle;" the first would extend at "an angle," but the second would extend at a different angle. In common claim language, one would extend at a first angle, and the second would extend at a second angle.

Additional dependent claims of both the '881 and '854 patents support Defendants' construction. As emphasized below, dependent claims from both patents state that the side walls each have a first portion with "a first angle" and a second portion with "a second angle."

> 7. The light emitting diode (LED) lighting arrangement for a lighting fixture as claimed in claim 6, wherein the first and second multi-faceted side walls each comprise a first portion defining *a first angle* with the base member and a second portion defining *a second angle* with the first portion.

DN 1-2, '854 Patent, claim 7.

> 9. A light emitting diode (LED) lighting arrangement for a lighting fixture as claimed in claim 8, wherein the side walls each comprise a first portion defining a *first angle* with the base member and a second portion defining *a second angle* with the first portion.

DN 1-3, '881 Patent, claim 9. This reinforces the requirement that both side walls extend from the lighting strip at the same angle and that the patentee knew how to claim the possibility of two different angles.[3]

Moreover, the provisional application to the '881 and '854 Patents (the "'713 Provisional") provides additional detail regarding the recited reflector having multiple portions that include

---

[3] "First" and "second" terminology would not, of course, require two different angles, but it (or similar) terminology is essential to claim scope encompassing that option.

various angles. Notably, however, the '713 Provisional describes how the first angle of the first

portion and the second angle of the second portion must be the same on both walls to maintain the

axis of symmetry.



With reference to FIG. 11, another possible configuration for the reflector is provided. Each of the reflectors 13" has several angles therein as shown in FIG. 11. *Each reflector 13" extends from base plate 3 at an initial angle of about 121° from an axis of symmetry X. The reflectors 13" then angle back towards the axis of symmetry X at an angle of about 165°.* This configuration creates an angle of about 60° between the ends 14" of each of reflectors 13".

**Ex. 1, '713 Provisional, Fig. 11, ¶0035 (emphasis added).[4]**

The specifications of the '854/'881 patents reinforce the plain claim language. First, as

reproduced below, the '854/'881 Patents illustrate five embodiments of the first and second side

walls[5] that extend from a base member and away from the lighting strip. Every embodiment

depicts only a single angle—labeled "θ"—between the reflector and light panel.



---

[4] The same disclosure is found in Provisional Application 61/094571 from which the '881/'854 patents also claim priority. (Ex. 2, '571 Provisional, Fig. 11, ¶0037.)

[5] The "side walls" are labeled "185" in Figure 16, "203" in Figure 17, "303" in Figure 19, "403" in Figure 20, and "517" in Figure 25.

8



**DN 1-3 and 1-2, '881/'854 patents, Figs. 16, 17, 19, 20 and 25.**

Second, the written description of the '881/'854 patents also does not describe any embodiment where the side walls extend from a base member at different angles. Instead, each embodiment is described as extending from opposite sides of the base member "at *an* angle" – i.e., the same angle. For example, the disclosure describing Figure 25 states: "[e]ach side wall 517 of reflector 513 extends from base member 515 *at an angle θ*." DN 1-3, '881 patent 19:41-42 and DN 1-2, '854 patent 20:4-5 (emphasis added). Figures 16, 17, 19, and 20 show embodiments (like the dependent claims discussed above) where the side walls are described as including a "first portion" and a "second portion." For each, the specification again states that for "each side wall" the first portion extends from the base portion (or light strip for Figure 17) at "*a first angle θ*" (and the second portion extends at a second angle Φ):

> [FIG 16] Each side wall 185 of reflector assembly 141 includes a first facet or first portion 186 defining *a first angle θ with the base portion* 184 of reflector 141 adjacent the bottom portion of light emitting portion 187 of LED 111, and a second facet or second portion 188 that defines *a second angle (ϕ) with first portion 186*.

DN 1-3, '881 patent 17:17-22 and DN 1-2, '854 patent 17:41-46 (emphasis added).

> [FIG 17] Each side wall 203 of reflector 200 includes a first portion 209 that *extends from base member 201 at a first angle θ* … [and] a second portion 211 that defines *a second angle Φ with the first portion 209*[.]

DN 1-3, '881 patent 17:61-66 and DN 1-2, '854 patent 18:19-24 (emphasis added).

9

[FIG 19] Each side wall 303 of reflector 300 includes a first portion 305 that *extends from lighting strip 9 or strip 109 at an initial or first angle θ* … [and] a second portion 307 that defines *a second angle Φ with the first portion 305*[.]

DN 1-3, '881 patent 18:33-38 and DN 1-2, '854 patent 18:61-66 (emphasis added).

[FIG 20] Each side wall 403 of reflector 400 includes a first portion 405 that *extends from base member 401 at a first angle θ* … [and] a second portion 407 that defines *a second angle Φ with the first portion 405*[.]

DN 1-3, '881 patent 18:55-61 and DN 1-2, '854 patent 19:19-24 (emphasis added).

Thus, the claim language itself, as well as all intrinsic evidence, supports Defendants' proposed construction. Both side walls extend from the "base member" or "lighting strip" at the same angle.

## B.    U.S. Patent No. 8,721,114

### 1.    "a first/second reflector extending from the central body adjacent to the first/second group of LEDs for directing light from the first/second group of LEDs in the illumination direction"

| U.S. Patent No. 8,721,114 | | |
|---|---|---|
| **Claim** | **Term** | **Defendants' Proposed Construction** |
| 1 | a first reflector extending from the central body adjacent to the first group of LEDs for directing light from the first group of LEDs in the illumination direction<br><br>a second reflector extending from the central body adjacent to the second group of LEDs for directing light from the second group of LEDs in the illumination direction | a first reflector extending from the central body adjacent to the first group of LEDs for directing light only from the first group of LEDs in the illumination direction<br><br>a second reflector extending from the central body adjacent to the second group of LEDs for directing light only from the second group of LEDs in the illumination direction |

As quoted above, claim 1 of the '114 patent requires first and second reflectors adjacent first and second groups of LEDs, respectively. As discussed below, the claims and intrinsic record show the first/second reflectors reflect light only from their respective first/second groups of LEDs.

10

First, as discussed on pages 4-5, the '114 patent discloses various embodiments where first and second reflectors are designed to direct light solely from their respective LEDs. For instance, Figure 1 discloses two groups of LEDs (highlighted in red and blue) that are mounted on side plates perpendicular to the illumination direction (D). The light emitted only from the first group of LEDs (red) will then be redirected by a first reflector (green) downward in the illumination direction "D" (as shown by red arrows). Likewise, the light emitted only from the second group of LEDs (blue) will then be redirected by a first reflector (yellow) downward in the illumination direction "D" (as shown by blue arrows).



FIG.1

"Direction D, an illumination direction, in FIG. 1 shows the direction between the device 1 and the illuminated space. The illumination direction is the direction in which light is directed from the device 1… Each of the LEDs of the light emitting portion of the LED faces a reflector 5, such that the direction of maximum intensity light emitted by the LEDs is substantially anti-parallel with the direction, D, separating the device 1 and the illuminated space. In other words. FIG. 1 is a device in which the LEDs may be oriented outwardly from the chimney side plates 3… The LEDs may be mounted such that the light is emitting at an angle approximately 90 degrees from the desired area. Light from the LEDs is directed toward the bottom of the device by the reflector, so that light is directed toward the opening 7 between the bottom of the chimney side piece 3 and the far edge 9 of the reflector 5."

**DN 1-5, '114 patent, Fig 1, 3:37-4:22**

Figure 7 (as well as Figure 8) discloses two groups of LEDs (highlighted in red and blue) that are mounted in the center of a first reflector (green) and second reflector (yellow). The light emitted only from the first group of LEDs (red) is directed by a first reflector (green) downward in the illumination direction "D" (as shown by red arrows). Likewise, the light emitted only from

11

the second group of LEDs (blue) is directed by a first reflector (orange) downward in the illumination direction "D" (as shown by blue arrows).



"As shown in FIG. 7, LEDs 104 are mounted to the center of the reflectors 105. As with all of the other variations shown herein, the LEDs may be individual light units, or they may be part of a strip, cluster or band… Reflectors 105 direct light from the LEDs toward the illuminated space. The Reflectors shown in FIG. 7 have a parabolic cross-sectional shape. Alternatively, the reflectors 105 can have one of a number of other suitable cross-sectional shapes, including v-shaped cross sections and c-shaped cross sections… This is because the LEDs 104 of the variations shown in FIGS. 7 and 8 can be mounted substantially downward (i.e., toward the diffuser) thanks to the presence of the diffuser 101 a. Mounting the LEDs 104 in the downward direction, as opposed to mounting them in a side-ways direction as sideways direction shown in FIG. 2, may increase the fraction of light intensity admitted by the LEDs 104 to the area to be illuminated."

**DN 1-5, '114 patent, Fig. 7, 5:64-6:31.**

During prosecution of the application that matured into the '114 patent, a preliminary amendment was filed which added claims 35 and 36 (below).[6] As shown, claim 35 recited only a single reflector, while claim 36 recited a "plurality of reflectors" with a "plurality of groups of LEDs":

---

[6] Claim 35 ultimately issued as independent claim 1. (Ex 3, '114 Patent File History, 12/20/2013 Issue Classification Claim Renumbering.)

35.    (New) An illumination device for providing light in an illumination direction, the illumination device comprising:

a central body having a surface facing the illumination direction;

a group of Light Emitting Diodes (LEDs) connected to the central body, wherein the LEDs are oriented in the illumination direction; and

a reflector extending from the central body adjacent to the group of LEDs for directing light from the group of LEDs in the illumination direction,

wherein the reflector comprises a first side and a separate second side opposing the first side, each side extending substantially along a longitudinal axis of the illumination device.

36.    (New) The illumination device of claim 35, further comprising:

a plurality of groups of LEDs; and

a plurality of reflectors, each reflector corresponding to at least one group of LEDs.

**Ex. 4, '114 Patent File History, 08/17/2012 Second Preliminary Amendment, p. 3.**

As presented, claims 35 (single reflector) and 36 (plurality of reflectors) were both rejected based on U.S. Patent Publication No. 2007/0228289 (Kaszuba) as shown below.

13



"Regarding claim 35, Kaszuba et al '289 discloses an illumination device for providing light in an illumination direction …, the illumination device comprising: … an elongated lamp 34 which can be a group of Light Emitting Diodes … a reflector 36 extending from the central body … adjacent to the (elongated light source or group of LEDs) for directing light from the group of LEDs in the illumination direction…

Regarding claim 36, the device further comprising: a plurality of groups of LEDs (see paragraph number 83, each elongated light source is an LED); and a plurality of reflectors 36, each reflector corresponding to at least one group of LED."

**Ex 5, Kaszuba, Figure 2 (shown on left)**
**Ex. 6, '114 Patent File History, 04/19/2013 Final Rejection, pp. 3-4 (shown on right).**

To overcome the above rejection, the patentee ultimately amended claim 35 and canceled claim 36 to expressly recite that the claimed "plurality of reflectors" are a separate and distinct "first" reflector having a "first" group of LEDs and a "second" reflector having a "second" group of LEDs.

14

35.    (Currently Amended)    An illumination device for providing light in an illumination direction, the illumination device comprising:

a central body having a surface facing the illumination direction and including a first heat dissipating mechanism for allowing heat to dissipate through a central portion of the central body;

a ~~group~~ first and second groups of Light Emitting Diodes (LEDs) connected to the central body directly or via an attachment feature, the first and second group of LEDs being spaced apart from each other;

a second heat dissipating mechanism including one or more openings formed in the central body or in the attachment feature; [[and]]

a first reflector extending from the central body adjacent to the first group of LEDs for directing light from the first group of LEDs in the illumination direction; and

a second reflector extending from the central body adjacent to the second group of LEDs for directing light from the second group of LEDs in the illumination direction,

wherein heat generated by the first and second groups ~~group~~ of LEDs is dissipated through the central body via the first heat dissipating mechanism, [[and]]

wherein the one or more openings of the second heat dissipating mechanism provide fluid flow cooling of the first and second groups ~~group~~ of LEDs, and

wherein one of the first and second heat dissipating mechanisms allows heat to dissipate between the first and second reflectors.

36.    (Canceled)

**Ex. 7, '114 Patent File History, 08/19/2013 RCE, p. 2.**

The patentee argued the patentability of this newly presented claim as shown in the table reproduced below. The patentee emphasized the new claim (shown below left with emphasis in original) was patentable over the prior art Kaszuba reference based on how the first and second reflectors directed light solely from their respective first/second group of LEDs. As shown below to the right, patentee "stressed" the amended claims were patentable because the "two separate distinct pluralities of LEDs" now required "separate reflectors directing light from the separate groups of LEDs."

15

| | |
|---|---|
| a central body having a surface facing the illumination direction and including a first heat dissipating mechanism for allowing heat to dissipate through a central portion of the central body;<br><br>*first and second groups of Light Emitting Diodes (LEDs)* connected to the central body directly or via an attachment feature, *the first and second group of LEDs being spaced apart from each other*;<br><br>a second heat dissipating mechanism including one or more openings formed in the central body or in the attachment feature;<br><br>*a first reflector* extending from the central body adjacent to the first group of LEDs for *directing light from the first group of LEDs* in the illumination direction; and<br><br>*a second reflector* extending from the central body adjacent to the second group of LEDs for *directing light from the second group of LEDs* in the illumination direction,<br><br>wherein heat generated by the first and second groups of LEDs is dissipated through the central body via the first heat dissipating mechanism,<br><br>wherein the one or more openings of the second heat dissipating mechanism provide fluid flow cooling of the first and second groups of LEDs, and<br><br>wherein one of the first and second heat dissipating mechanisms allows heat to dissipate *between the first and second reflectors*. | The Applicants respectfully submit that even if the cited structure of Kaszuba could be considered to be an illumination device because it targets light as part of the curing process (not admitted), it certainly does not teach or suggest at least the arrangement of LEDs and reflectors as recited by amended claim 35. When addressing now canceled claim 36, which recited a plurality of LEDs and a plurality of reflectors, the Office Action cited paragraph [0083] and element 36 in the Figures of Kaszuba. However, the Applicants respectfully submit that paragraph [0083] only very generically mentions that "bulbs" made be used, at most implying that a plurality of bulbs may replace the single bulb shown in the figures (not admitted). With respect to multiple reflectors, as shown in Figure 3, element 36 is a single reflector. Even if one were to consider the single reflector 36 to be more than one reflector, and the bulb 24 were considered to represent a plurality of bulbs (not admitted), at least the relationship between the bulbs and the reflectors established by amended claim 35 is not taught as suggested. As noted above, **claim 35 stresses first and second groups of LED's that are spaced apart from one another (i.e., two separate distinct pluralities of LED's, not just a plurality) and first and second reflectors, each reflector directing light of one of the groups of the LEDs.** At most, the single (or even if considered multiple) reflector 36 surrounds a single (or even if considered multiple) bulb 34. **Thus, the alleged "multiple" reflectors of Kaszuba all direct light from the same alleged multiple bulbs, while amended claim 35 requires separate groups of LED's and separate reflectors directing light from the separate groups of LEDs**. |
| EX. 7, 8-19-2013 RCE at 7 (emphasis original). | EX. 7, 8-19-2013 RCE at 8-9 (emphasis added). |

16

Patentee's amendment and arguments during prosecution are not only strong intrinsic evidence of the claim's meaning, but they are also a clear and unmistakable disavowal of any claim scope that would cover the first reflector reflecting light emitted from any LEDs other than the first group of LEDs and the second reflector reflecting light emitted from any LEDs other than the second group of LEDs. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (finding disavowal based on patentees' statements during prosecution and stating that "[s]tatements made during prosecution may [] affect the scope of the claims . . . for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art") (citations omitted).

For these reasons, claim 1 requires first/second reflectors that direct light *only* from their respective first/second group of LEDs.

## C.    U.S. Patent No. 9,049,753

### 1.    "a communication component positioned between the power supply device and the light source"

| U.S. Patent No. 9,049,753 | | | |
|---|---|---|---|
| Claim | Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| 1 | a communication component positioned between the power supply device and the light source | Plain and ordinary meaning | a communication component electrically positioned between the power supply device and the light source |

The claim language at issue appears in claim 1, which is directed to "[a] light fixture monitoring and communication device" which is "located internal to the light fixture." DN 1-1, '753 Patent 16:2-3, 13-14. The disputed language requires "a communication component positioned between the power supply device and the light source."

17

The only "power supply device" described in the specification is the AC-to-DC power supply device disclosed with respect to Figure 2 which operates to receive AC voltage from a "power source" and provide DC voltage for powering the light fixture.

> FIG. 2 illustrates a power supply device 20 positioned between the communication device 10 and a surge protection device 30. The surge protection device 30 is positioned between the AC power source 80 and the power supply 20. The power supply device 20 receives AC power 60 and outputs DC power 50 for use by the lighting fixture.

DN 1-1, '753 Patent 8:55-60.

While the specification does not expressly include the phrase a "communication component," the '753 patent does disclose a "communication device 10" in describing Figure 2. The specification then makes clear, the "communication device 10 [is] *positioned* on the DC side of the system *so that no direct connection between the AC and DC side is provided* other than the power supply 20." (DN 1-1, '753 Patent, 11:11-14; emphasis added.)



**DN1-1, '753 Patent, Fig. 2**

18

The specification describes another electrical purpose for locating the communication device on the DC side of a power supply 20, i.e., "this side will be protected from surges in the AC current or voltage."   DN 1-1, '753 Patent 8:39-40.

Thus, the specification makes clear that the communication component's position is driven by operational/electrical reasons not concerned with the physical or spatial location. For these reasons, the claim should be construed to require that the communication component be *electrically* positioned between the power supply device and light source.

### 2. "monitor for monitoring an operational characteristic of a light source comprised in the light fixture"

| U.S. Patent No. 9,049,753 | | | |
|---|---|---|---|
| **Claim** | **Term** | **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| 1 | monitor for monitoring an operational characteristic of a light source comprised in the light fixture | The term "monitor for monitoring" is not a means/step function and the term should be construed as "plain and ordinary" | The term "monitor for monitoring" is a means/step-plus-function clause under pre-AIA 35 U.S.C. § 112 ¶ 6, with:<br><br>**Function**: monitoring an operational characteristic<br><br>**Structure**: the corresponding structure is not linked and the claim is therefore indefinite under 35 USC 112 ¶1. |

#### a. "monitor for monitoring …" is indefinite

##### (1) "monitor for monitoring …" is a means-plus function limitation

The '753 Patent's "monitor for monitoring …" limitation is purely functional and therefore invokes § 112, ¶ 6. The "monitor for monitoring …" limitation recites a generic term (i.e., monitor) that provides no structure to perform a certain function (i.e., "monitoring an operational

characteristic of a light source comprised in the light fixture"). Applying the *Williamson* factors to the "monitor for monitoring ..." limitation confirms it is governed by § 112, ¶ 6.

For the first and fourth *Williamson* factors, the entire claim term operates as a substitute for "means" by setting forth a "black box recitation of structure" ("monitor") for providing a specified function ("monitoring an operational characteristic . . . ) as if the word "means" had been used. *Id.* at 1349-50. This becomes apparent if the word "means for" is substituted for "monitor for," as the clause would read "means for monitoring an operational characteristic of a light source comprised in the light fixture." Accordingly, the patentee drafted this limitation in a means-plus-function format.

For the second and third *Williamson* factors, "monitor" is a generic term that does not provide any indication of structure, and there is no prefix that imparts additional structure. See *Verint Sys. v. Red Box Recorders, Ltd.*, 166 F. Supp. 3d 364, 381-383 (S.D.N.Y. 2016) (finding that the claim terms "monitoring system" and "monitoring device" do not provide sufficient structural support when "monitoring" was used in its generic sense). Consequently, the claim term "monitor for monitoring ..." does not connote sufficient structure and only indicates some type of function (i.e., monitoring) performed by a generic structure.

As to the fifth *Williamson* factor, the remainder of the claim fails to impart any structure for performing the claimed monitoring function. Nothing in the claim language describes how the "monitor for monitoring ..." monitors the operational characteristics of a light source, or what structure would accomplish this function. Accordingly, the remaining claim language provides little, if any, description of how the claimed "monitor" interacts with other claim components to inform a POSITA of the structural character of the "monitor."

20

Thus, all of the *Williamson* factors show that the claim term "monitor for monitoring …" fails to recite a sufficiently definite structure, and the Court should construe it under § 112, ¶ 6.

### (2) The '753 Patent does not disclose a corresponding structure or algorithm for the "monitor for monitoring …" limitation.

The "monitor for monitoring …" limitation is indefinite because the specification of the '753 Patent does not clearly link any structure for performing the claimed function. A means-plus-function limitation is indefinite if a POSITA "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Noah Sys. Inc.*, 675 F.3d at 1312. The '753 Patent discloses no such structure for the claimed "monitor for monitoring …" or its claimed function—that is, "monitoring an operational characteristic of a light source comprised in the light fixture." Without such a description, a POSITA (and the public) are left to guess about what structures are covered by (and allegedly infringe) the claim.

During the meet and confer on claim construction, Defendants' counsel asked Plaintiff's counsel to identify the alleged corresponding structure for this claim limitation in the intrinsic evidence. Plaintiff's counsel stated it was found in the specification but did not specify where. (Ex. 8, 6/23-24/2022 email string between counsel); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("The duty of a patentee to clearly link or associate structure with the claimed function is the *quid pro quo* for allowing the patentee to express the claim in terms of function under section 112, paragraph 6.") As such, the '753 Patent fails to describe a "corresponding" structure for "monitor for monitoring …" thereby making the claims indefinite. *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1007 (Fed. Cir. 2021) ("[I]f the patentee fails to disclose adequate corresponding structure, the claim is indefinite.")

21

DATED:  June 27, 2022                    Respectfully submitted,

By: */s/* John P. Rondini
Frank A. Angileri (MI-P45611)
Thomas W. Cunningham (MI-P57899)
John P. Rondini (MI-P72254)
BROOKS KUSHMAN P.C.
1000 Town Center, 22nd Floor
Southfield, MI 48075
(248) 358-4400/ F: (248) 358-3351
fangileri@brookskushman.com
tcunningham@brookskushman.com
jrondini@brookskushman.com

Jennifer Parker Ainsworth
WILSON, ROBERTSON & CORNELIUS, P.C.
908 ESE Loop 323, Suite 400
Tyler, TX 75701
jainsworth@wilsonlawfirm.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 27, 2022 a true and correct copy of the

foregoing document was served upon all counsel of record via electronic mail to the addresses

shown below:

| | |
|---|---|
| Thomas G. Southard<br>Brian S. Seal<br>Shaun D. Gregory<br>Taft Stettinius & Hollister LLP<br>200 Massachusetts Ave N.W., Suite 500<br>Washington, DC 20001<br>(202) 664-1545<br>tsouthard@taftlaw.com<br>bseal@taftlaw.com<br>sgregory@taftlaw.com<br><br>Jaimin Hemendra Shah (Pro Hac Vice)<br>Taft Stettinius & Hollister LLP<br>111 E. Upper Wacker<br>Chicago, IL 60601<br>Telephone: (312) 836-4171<br>jshah@taftlaw.com<br><br>Richard E. Gaum (Pro Hac Vice)<br>Taft Stettinius & Hollister LLP<br>200 Public Square, Suite 3500<br>Cleveland, OH 44114<br>Telephone: (216) 241-2838<br>Facsimile: (216) 241-3707<br>egaum@taftlaw.com | Mark D. Siegmund - State Bar No. 24117055<br>Craig D. Cherry - State Bar No. 24012419<br>Justin Allen - State Bar No. 24081977<br>STECKLER WAYNE COCHRAN<br>CHERRY, PLLC<br>8416 Old McGregor Road<br>Waco, Texas 76712<br>Telephone: (254) 651-3690<br>Facsimile: (254) 651-3689<br>mark@swclaw.com<br>craig@swclaw.com<br>justin@swclaw.com |

_/s/  John P. Rondini_

23